El Juez Asociado Señor Martínez Torres
emitió la opinión del Tribunal.
Se nos solicita la revocación de una sentencia del Tribunal de Apelaciones. Allí se confirmó al Tribunal de Primera Instancia, Sala de San Juan, que desestimó el reclamo de la parte peticionaria, el Dr. Rafael Santiago Aponte, la Sra. María Otero Suria y la Sociedad Legal de Bienes Ganan-ciales que ambos componen, para que se les reconozca como accionistas de la corporación Emergency & Pediatric Specialists of Puerto Rico, P.S.C. (E.P.S.P.R.).
*208 Por entender que los acuerdos a los que llegaron las partes y sus actos convirtieron al peticionario en accionista de la corporación, revocamos. No es posible que exista una corporación con fines de lucro sin accionistas. Concluir lo opuesto contraviene la derogada Ley General de Corpora-ciones, Ley Núm. 144 de 10 de agosto de 1995,(1) 14 L.P.R.A. see. 2601 et seq., aplicable a este caso, y los por-menores de los acuerdos a los que llegaron las partes.
I
Los doctores recurridos, Maribel Rodríguez Martínez, Javier Cuevas Marrero y el peticionario, se reunieron el 14 de diciembre de 2005 para ultimar los detalles de la corpo-ración que sucedería al Grupo Emergencias Pediátricas A & J. Esta corporación prestaba el servicio expreso de emer-gencias pediátricas al Hospital Auxilio Mutuo. Se des-prende de la minuta de esa reunión que surgió la necesi-dad de incorporar una nueva entidad, bajo un nuevo nombre, ante la llegada de socios adicionales. Se seleccionó Emergency & Pediatric Specialists of Puerto Rico, P.S.C. (E.P.S.P.R.) como la primera opción de nombre para la nueva corporación.
Además, consta en la minuta que la participación de los tres galenos en la corporación por crearse sería de un 30% para cada uno, lo que sumaba un 90% de las acciones. El restante 10% se reservaría como ahorro o por si surgía al-gún otro socio. Ese día también se acordó una paga de $7,000 mensuales para los doctores Cuevas Marrero y Santiago Aponte, y de $9,000 para la doctora Rodríguez Mar-tínez, adicionales a lo que devengaran por los turnos de trabajo. Los doctores Rodríguez Martínez y Santiago *209 Aponte, quienes se identificaron como presidenta y secre-tario, respectivamente, firmaron la minuta.
E.P.S.P.R. se incorporó como una corporación de servi-cios profesionales el 20 de diciembre de 2005. El propósito que consta en su certificado de incorporación, es prestar servicios pediátricos de emergencia a instituciones hospitalarias. El doctor Santiago Aponte figuró como su incorporador y el doctor Cuevas Marrero como agente residente. Además, ambos constan como directores de la corporación, junto con la doctora Rodríguez Martínez. Se-gún el certificado de incorporación, los tres galenos fungi-rían como directores hasta la primera reunión anual de accionistas o hasta que sus sucesores les reemplazaran. Se informó ante el Departamento de Estado que la corpora-ción emitiría 100 acciones por el valor de $100 cada una.
En la primera reunión de la Junta de Directores de E.P.S.P.R., el 20 de enero de 2006 se escogió a la doctora Rodríguez Martínez como presidenta, al doctor Santiago Aponte como secretario y al doctor Cuevas Marrero como tesorero de la corporación. Ese día también se aprobó una moción para que los tres oficiales corporativos electos, a quienes se les reconoció como accionistas, condujeran todos los asuntos de la corporación sin la necesidad de otro cuerpo de gobierno.(2)
Además, la nueva Junta de Directores de E.P.S.P.R. aco-gió una resolución para emitir y vender el 90% de las ac-ciones a los tres galenos, a razón de 30% para cada uno, a $100 por acción,(3) conforme lo acordado. También se apro-baron, mediante resolución, los estatutos corporativos. Los *210 acuerdos mencionados obtuvieron el aval unánime de los directores, según consta en la minuta que firmó el doctor Cuevas Marrero, quien presidió la primera reunión de la Junta, y el Sr. Thomas J. Bryan, quien actuó como secre-tario por invitación.
Se imprimieron tres certificados de acciones fechados ese mismo día, 20 de enero de 2006, a nombre de cada uno de los doctores. Cada certificado representa 30 acciones a $100 cada una, que se dan por pagadas. Sin embargo, nin-guno de los certificados está firmado. Una hoja de un libro corporativo reconoce a los tres médicos como accionistas y hace mención de los tres certificados como emitidos ese día, pero no se reconocen como pagados.
El 22 de febrero de 2006 la corporación otorgó un con-trato con el Hospital Español Auxilio Mutuo de Puerto Rico para prestarle servicios médicos profesionales de emergen-cias pediátricas. En aras de financiar las operaciones de la empresa, los tres galenos ofrecieron sus bienes personales, solidariamente, como garantía para obtener una línea de crédito de Oriental Bank & Trust, ascendente a $100,000.
En el expediente del caso constan varias minutas de las reuniones de los directivos de E.P.S.P.R. en que se tratan diferentes asuntos administrativos. Todas constan como preparadas por la presidenta, la doctora Rodríguez Martí-nez, y firmadas, además, por el doctor Santiago Aponte, como secretario. Las reuniones contaban con la asistencia del doctor Cuevas Marrero.
El 27 de noviembre de 2006 el doctor Santiago Aponte envió un correo electrónico a los doctores Rodríguez Martí-nez y Cuevas Marrero en que expresó su molestia porque *211 tomaban decisiones sobre sus responsabilidades sin con-sultarle, a pesar de ser socio en igual jerarquía que ellos. Además, se atribuyó formar el grupo de emergenciólogos que atendían en sala de emergencias y contribuir a la cor-poración en todo lo que había sido necesario.
En la misma comunicación, el doctor Santiago Aponte describió el acuerdo al que habían llegado para que él pu-diera ser socio con igual cantidad de acciones que los otros dos galenos. Consistía en que los tres garantizarían la lí-nea de crédito obtenida y, además, él tendría que pagar $25,000 por participar del negocio. El pago de esos $25,000 se diferiría hasta el momento cuando la corporación estu-viera en condición de desembolsarle los dividendos que le correspondieran. Además, el doctor Santiago Aponte reci-biría una compensación de $10,000 mensuales, que se re-dujo a $7,000 mensuales, por falta de dinero en la corporación. De igual forma, Cuevas Marrero y Rodríguez Martínez tuvieron que reducir su compensación en $3,000 mensuales, a $7,000 y $9,000, respectivamente, describió.
La doctora Rodríguez Martínez contestó el correo elec-trónico el 29 de noviembre de 2006. Respondió que espe-raba que sus inquietudes se discutieran en la reunión que sostendrían esa tarde. De la minuta de esa reunión, a la que asistieron los tres miembros de la Junta de Directores de E.P.S.P.R., surge que se acordó aumentar el pago por los servicios profesionales de los doctores Cuevas Marrero y Santiago Aponte a $10,000.
En el expediente del caso, varias minutas de reuniones evidencian que el doctor Santiago Aponte tuvo participa-ción en dar seguimiento a la facturación de servicios a los planes médicos. Sostuvo diversas reuniones con la primera facturadora, Leydimar León, y quien sustituyó sus servi-cios, Muriel Martínez Montero, de la empresa Med Bill Services, Inc., y el doctor Cuevas Marrero. Las minutas de esas reuniones están fechadas entre junio 2006 y julio de 2007. También surge del expediente que el doctor Santiago *212 Aponte se encargó del reclutamiento de emergenciólogos y la asignación de sus turnos de trabajo.
En una reunión que se celebró el 3 de agosto de 2007, los doctores Rodríguez Martínez y Cuevas Marrero infor-maron al doctor Santiago Aponte que “por la situación eco-nómica de la Corporación no es viable que continúe su par-ticipación como socio de la Corporación y a [sic] los privilegios de Esta [sic]”. Se le ofreció continuar con su trabajo como emergenciólogo durante dos meses, “en lo que consigue otro trabajo”, y se le invitó a que “ponga precio a la terminación de esta relación”. En la minuta de la re-unión se hizo constar que el peticionario entendía que, por la situación económica de la corporación, no se habían pa-gado dividendos. Además, se reconoció que ninguno de los accionistas había hecho pagos por las acciones asignadas. Apéndice, págs. 37 y 148.
En la minuta de la siguiente reunión, celebrada el 9 de agosto de 2007, se indica que el doctor Santiago Aponte “aceptó desvincularse de la corporación como oficial” y que dejaría de trabajar como emergenciólogo el 1 de septiembre de 2007. En el documento se tachó una frase que leía que el doctor Santiago Aponte también aceptaba desvincularse como accionista. Esa tachadura tiene las iniciales de los doctores Rodríguez Martínez y Santiago Aponte.
El doctor Cuevas Marrero informó en esa reunión que gestionaría con el abogado la terminación de la participa-ción del doctor Santiago Aponte en la corporación. De igual forma, tramitaría su liberación de la garantía que prestó para la obtención de la línea de crédito con Oriental Bank & Trust. Esa liberación ocurrió el 26 de septiembre de 2007.
La parte demandada presentó un documento titulado Acuerdo de Renuncia a Participación Corporativa, que te-nía como propósito desvincular al doctor Santiago Aponte de la corporación. Sin embargo, el documento no está fir-mado ni precisa qué día del mes de agosto del 2007 estaba *213 supuesto a firmarse. En ese documento aparecen como comparecientes los tres doctores miembros de la Junta de Directores. El inciso (1) del documento indica que “[l]os comparecientes en este acuerdo componen la totalidad de los accionistas de Emergency & Pediatric Specialists of Puerto Rico, P.S.C. ...”. Además, en sus incisos (2) y (3) se hace referencia a “los demás accionistas” para referirse a los doctores Cuevas Marrero y Rodríguez Martínez. En la parte en que se suponía firmaran los tres galenos, se iden-tifica al doctor Santiago Aponte como accionista. Apéndice, pág. 210.
Entre otras cosas, el doctor Santiago Aponte reconocía en ese borrador de acuerdo que no hizo aportación econó-mica a la corporación porque no se emitieron los certifica-dos de acciones. En ese momento, la corporación operaba con su cuenta de reserva y no estaba en posición de distri-buir dividendos, indica el documento.
La parte demandada acepta que hubo un acuerdo que permitía al doctor Santiago Aponte pagar los $25,000 con los dividendos que le correspondieran de la distribución que eventualmente hiciera la corporación. Además, los doc-tores Rodríguez Martínez y Cuevas Marrero aceptan que tampoco han pagado por las acciones que se les asignó en la resolución de la Junta de 20 de enero de 2006.
Los peticionarios presentaron una demanda el 18 de oc-tubre de 2007. Solicitaron un interdicto preliminar y per-manente, sentencia declaratoria, y daños y peijuicios. Ale-garon que los demandados les privaron de su propiedad y derechos como accionistas, en violación de la Ley General de Corporaciones y del debido proceso de ley contractual. Los demandados pidieron la desestimación. Argumentaron que el doctor Santiago Aponte no era accionista de la cor-poración porque nunca pagó por las acciones.
El Tribunal de Primera Instancia, Sala de San Juan, concluyó el 24 de octubre de 2008 que el demandante no era accionista porque no pagó el valor de las acciones; que *214 su desvinculación como secretario de la corporación fue vo-luntaria y que realizó funciones administrativas para la corporación por las que no recibió remuneración. En su resolución, desestimó la solicitud de injunction, pero refirió el pleito a una sala de lo civil para que evaluara si era acreedor de una compensación económica ante la posibili-dad de que se le hubiera despedido en violación del debido proceso contractual y por el trabajo que realizó como pro-motor de la corporación. Inconforme, el doctor Santiago Aponte acudió al foro apelativo intermedio.
El Tribunal de Apelaciones confirmó al foro de primera instancia el 30 de octubre de 2009. Concluyó que ninguno de los galenos pasó a ser accionista de la corporación por-que no pagaron por las acciones. Estimó como determi-nante el hecho de que ninguno de los certificados de accio-nes fuera entregado. Así resolvió que se trata de una corporación sin accionistas.
El 7 de mayo de 2010 expedimos el auto de certiorari. Con el beneficio de los alegatos de las partes, procedemos a resolver.
II
Las leyes corporativas son un instrumento que utilizan los gobiernos para estimular el desarrollo empresarial y económico. Exposición de Motivos de la Ley Núm. 144 de 10 de agosto de 1995, (Parte 1) Leyes de Puerto Rico 620; Exposición de Motivos de la Ley General de Corporaciones, Ley Núm. 164 de 16 de diciembre de 2009 (14 L.P.R.A. sec. 3501 et seq.). La figura de la corporación facilita el desarrollo de empresas porque se le reconoce una personalidad jurídica distinta a la de sus dueños o miembros, quienes por lo general no responderán con sus bienes personales por los actos de la corporación, sino hasta el monto de su inversión. C.E. Díaz Olivo, Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, pág. 11.
*215 El ordenamiento reconoce varios tipos de corporaciones, y la Ley General de Corporaciones de 1995, al igual que la vigente Ley General de Corporaciones de 2009, recoge al-gunos de ellos. Aunque se concentra principalmente en las corporaciones con fines de lucro, la Ley General de Corpo-raciones de 1995 dedicaba uno de sus capítulos (el XXII) 14 L.P.R.A. sec. 3421a et seq., a establecer las diferencias de las corporaciones sin fines de lucro.
En términos generales, las corporaciones sin fines lucrativos carecen de autorización en ley para emitir acciones. Art. 19.04 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 3421c). Sus ingresos, si alguno, no pueden distribuirse entre sus miembros, directores y oficiales. González v. Alicea, Div. Soc. Asist. Legal, 132 D.P.R. 638, 650 (1993). Si llegaran a generar ganancias, por lo general, se reinvierten en alcanzar el propósito de la corporación. Art. 19.02 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 3421a); L.M. Negrón Portillo, Derecho Corporativo Puertorriqueño, 2da ed., [ed. de autor], 1996, págs. 7 y 256. Por consiguiente, las corporaciones sin fines de lucro no tienen accionistas. En su lugar, pueden optar por tener miembros si así se establece en el certificado de incorporación o en sus estatutos corporativos. Art. 19.05 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 3421d).
Por otro lado, las corporaciones con fines lucrativos se dedican a hacer negocios y se caracterizan por repartir las ganancias entre sus accionistas. Negrón Portillo, op. cit., pág. 6. El accionista es un propietario de la corporación con fines de lucro. Quien sea titular de las acciones de una corporación posee una parte alícuota de su capital, un derecho general a participar de sus ganancias y la distribución de sus activos en caso de liquidación. Díaz Olivo, op. cit., pág. 148. “Una acción es un interés o cuota perteneciente al accionista individualmente en la propiedad de *216 la corporación.” López Martínez v. Yordán, 104 D.P.R. 594, 596 (1976).
Cuando una corporación con fines de lucro está por crearse, sus acciones se adquieren mediante un contrato de suscripción. También se adquieren por contrato de suscripción acciones de una corporación existente, que proyecta emitir acciones nuevas. Negrón Portillo, op. cit., pág. 254.
El contrato de suscripción de acciones se diferencia de un contrato de compra y venta de acciones en que se trata de acciones por emitirse o crearse, y no de la transferencia de titularidad de unas acciones ya existentes de una corporación. El contrato debe indicar, al menos de forma general, la naturaleza y propósito principal de la corporación por crearse, el capital autorizado, el tipo y número de acciones autorizadas, y la clase, el valor y la cantidad de acciones relacionadas a la suscripción. 4 Fletcher Cyc Corp. Sec. 1363.10, págs. 25 — 26 (2005).
Conforme sostiene la jurisprudencia, un contrato de suscrip-ción de acciones es similar a cualquier otro contrato. Si existe una causa válida, la conjunción de voluntades y un objeto lí-cito, el contrato queda perfeccionado. No es necesario que conste por escrito, a menos que la carta constitutiva de la cor-poración, su reglamento o las leyes del estado así lo requieran. Progreso Financiero, Inc. v. Gómez, 55 D.P.R. 850, 854 (1940).
El Art. 5.17 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 2777) especifica que un contrato de suscripción de acciones tiene que constar por escrito para que pueda hacerse valer contra un suscriptor. Los términos de una suscripción son irrevocables, salvo que conste el consentimiento de todos los suscriptores o de la corporación. Art. 5.16 de la Ley General de Corporaciones de 1995 (14 L.PR.A. see. 2776). Un suscriptor de acciones puede tener obligaciones y derechos como accionista, dependiendo de la ley, los estatutos corporativos o el *217 acuerdo de suscripción. Fletcher Cyc Corp., supra, Vol. 4, See. 1375, págs. 49-52.
La doctrina de actos propios impide a los suscriptores, accionistas y corporaciones negar la validez de una suscripción que aceptaron, aunque esta incumpla con las formalidades requeridas por la ley y los estatutos corporativos, a menos que ese incumplimiento haga la suscripción absolutamente nula. Si una corporación reconoció a un suscriptor como un accionista, no puede negar la validez de su suscripción. Fletcher Cyc Corp., supra, Vol. 4, Sec. 1969, págs. 754-755.
La raíz de la doctrina de actos propios se encuentra en el principio general de derecho que exige el proceder de buena fe. A nadie le es lícito obrar contra sus actos. Tampoco puede asumir una conducta contradictoria a una actuación previa que generó expectativas en quien confió en ese obrar. Vivoni Farage v. Ortiz Carro, 179 D.P.R. 990 (2010); Pardo v. Sucn. Stella, 145 D.P.R. 816, 829 (1998); Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 876 (1976).
La junta de directores de una corporación determina la forma como se pagará por la adquisición de las acciones. El Art. 5.02 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 2762) precisaba que el pago se hará con dinero en efectivo, servicios prestados, bienes muebles, bienes inmuebles, alquiler de bienes inmuebles o una combinación de las anteriores. Los tratadistas coinciden en que, cuando se habla de servicios prestados en este contexto, se hace referencia a servicios realizados en el pasado, no servicios que se prestarán en el futuro. Díaz Olivo, op. cit., pág. 159; Negrón Portillo, op. cit., pág. 235. El Art. 5.02 de la Ley General de Corporaciones de 2009 (14 L.P.R.A. sec. 3582), presenta un lenguaje más amplio al señalar que se pueden pagar las acciones, además, con “cualquier otro beneficio para la corporación”.
*218 Además, las acciones se pueden adquirir mediante pagos parciales o, incluso, fiarse. Negrón Portillo, op. cit., pág. 236. “Toda corporación podrá emitir la totalidad o cualquier parte de sus acciones como acciones parcialmente pagadas las cuales estarán obligadas por el balance del precio que haya de pagarse por las mismas.” Art. 5.07 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 2767).
Esos pagos parciales pueden hacerse mediante cual-quiera de los mecanismos de pago que reconoce el Art. 5.02 de la Ley General de Corporaciones de 1995, supra. Es decir, pueden hacerse con dinero en efectivo, servicios pres-tados, bienes muebles, bienes inmuebles, alquiler de in-muebles o una combinación de estos. Una acción que se adquiere mediante pagos parciales también se conoce como una “acción a precio aplazado”. Díaz Olivo, op. cit., pág. 162.
Las ganancias de una corporación se distribuyen entre sus accionistas en forma de pagos que se conocen como dividendos. Una corporación paga dividendos cuando hay un sobrante o ganancia, pero una corporación puede tener ganancias y optar por no pagar dividendos. Díaz Olivo, op. cit., pág. 164; Negrón Portillo, op. cit., pág. 256. La decisión de pagar dividendos recae en el buen juicio comercial de los directores de la corporación, a menos que los estatutos o artículos de incorporación impongan algún tipo de limitación. Los tribunales deben abstenerse de interferir con el buen juicio comercial en ausencia de fraude, mala fe u otro claro abuso de discreción. 11 Fletcher Cyc Corp. See. 5325, págs. 578-587 (2003).
Entre los tipos de corporaciones con fines de lucro que reconocen la Ley General de Corporaciones de 1995 y la de 2009, se encuentran las corporaciones de servicios profesionales. Estas solo pueden organizarse para practicar una profesión cuyo ejercicio exija una licencia como requisito de ley. Tienen que crearla uno o más individuos *219 licenciados para ejercer la profesión para la cual se orga-nizó, y solo personas licenciadas pueden ser sus accion-istas. Véanse los Arts. 18.01 y 18.02 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. secs. 3401 y 3402). Véanse, además, los Arts. 18.01 y 18.02 de la Ley General de Corporaciones de 2009 (14 L.P.R.A. secs. 3921 y 3922).
Al igual que a la corporación regular, a la corporación profesional se le reconoce una personalidad distinta a la de sus accionistas. Sin embargo, tiene la particularidad de que la responsabilidad de estos no se limita al monto de su inversión en la corporación si se trata de reclamaciones relacionadas con la actividad profesional regulada. La responsabilidad directa del profesional frente al cliente se mantiene. Art. 18.06 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 3406). Además, si uno de los accionistas queda descalificado del ejercicio de la profesión, tiene que cesar su relación con la corporación. Art. 18.09 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. sec. 3409); Díaz Olivo, op. cit., págs. 359 — 361.
III
Del expediente del caso se desprende que la corporación y los otros galenos trataron a Santiago Aponte como accio-nista desde el comienzo de la entidad. Incluso, lo visuali-zaron como tal desde antes de que la corporación se inscri-biera en el Departamento de Estado. Por consiguiente, no pueden ahora ir contra sus propios actos y negarle ese reconocimiento.
Si no se hubiera reconocido al doctor Santiago Aponte como accionista, ¿cómo podría explicarse el acuerdo de que pagaría $25,000 para saldar sus acciones con el dinero que obtuviera del pago de dividendos? Como define el derecho reseñado, los dividendos son la distribución de las ganan-cias de una corporación entre sus accionistas. No es posible *220 que se paguen dividendos a una persona a quien no se le considera accionista. El mero hecho de que se acordara que el doctor Santiago Aponte participaría de la distribución de dividendos es un reconocimiento de que es accionista de la corporación.
La Ley General de Corporaciones de 1995 confiere a la Junta de Directores el poder de determinar la forma en que se pagarán las acciones, siempre y cuando el pago se haga en efectivo, servicios prestados, bienes muebles, bie-nes inmuebles, alquiler de bienes inmuebles o una combi-nación de estos. Art. 5.02 de la Ley General de Corporacio-nes de 1995, supra. Además, la Junta tiene facultad para vender acciones a precio aplazado, es decir, acciones par-cialmente pagadas. Art. 5.07 de la Ley General de Corporaciones de 1995, supra.
De los actos de la junta de directores de E.P.S.P.R. se desprende una aceptación a que el doctor Santiago Aponte pagara parcialmente las acciones de la corporación con sus servicios. Aunque esa intención nunca se plasmó por es-crito, de los actos de las partes no puede interpretarse otra cosa. Solo así podría explicarse que la corporación estu-viera dispuesta a distribuirle dividendos con los que, a su vez, el galeno pagaría los $25,000 acordados. Cuando el pago de esos dividendos sumara $25,000, la deuda por el 30% de las acciones que se le asignó quedaría saldada. A partir de ese momento adquiriría plenos derechos como accionista.
El reconocimiento del doctor Santiago Aponte como ac-cionista se evidenció en varias instancias. En la primera reunión de la junta de directores, una vez se incorporó E.P.S.P.R., se aprobó unánimemente una resolución para emitir 90 acciones. Estas se venderían a los accionistas Maribel Rodríguez Martínez, Rafael Santiago Aponte y Javier Cuevas, a razón de 30 acciones por accionista. Ellos pagarían $100 por acción. Eso contrasta con los $25,000 que se acordó que el doctor Santiago Aponte pagaría por su participación. Tampoco coincide con que pagara parte de *221 las acciones con su servicio, pero sí armoniza con que el doctor Santiago Aponte tenía derecho al 30% de las accio-nes y que se le consideró como accionista desde ese momento.
Además, en el expediente consta una certificación en que se reconoce al peticionario como accionista. El doctor Cuevas Marrero firmó la certificación el 20 de enero de 2006 como presidente de E.P.S.P.R. Ese fue el día cuando se celebró la primera reunión de la junta de directores, en la que el doctor Cuevas Marrero fungió como presidente. El hecho de que el doctor Cuevas Marrero se limitara a firmar la carta que redactó el doctor Santiago Aponte no cambia el hecho de que, con su firma, avaló el contenido del documento.
En la minuta de la reunión de 9 de agosto de 2007 se tachó el dato de que el doctor Santiago Aponte aceptaba desvincularse como accionista, aunque sí aceptó apartarse como oficial de la corporación. En ese mismo encuentro, según consta en el documento, el doctor Cuevas Marrero se comprometió a gestionar la terminación de la participación del galeno peticionario como accionista. De ese compromiso se tiene que deducir un reconocimiento de que había que realizar gestiones adicionales para que el doctor Santiago Marrero dejara de figurar como accionista. De igual forma, hubo un borrador del acuerdo en que se le reconoció como accionista de la corporación.
Los demandados aducen que al doctor Santiago Aponte se le hicieron pagos mensuales por sus servicios. Según esa interpretación, no podría concluirse que las acciones que-daron parcialmente pagadas con el trabajo realizado. Sin embargo, se tiene que mirar el contrato entre las partes como un todo. El galeno prestó servicios como emergenció-logo, realizó tareas administrativas, participó como miem-bro de la junta de directores, de la que fue su secretario, y dio su firma para la obtención de la línea de crédito con la que E.RS.RR. operó desde sus inicios. Todo este esfuerzo *222 se le remuneró con los pagos mensuales. Las gestiones en la promoción y organización de la corporación quedaron pagadas con titularidad parcial de las acciones, por las que además tendría que pagar $25,000.
Así pues, es evidente que desde antes de la incorpora-ción de E.P.S.P.R., surgió entre las partes un contrato de suscripción por las acciones que eventualmente se emitirían. El contrato nació desde la primera reunión que sostuvieron los entonces futuros accionistas el 14 de diciembre de 2005. En esa reunión se reafirmó el propósito de la corporación por crearse, la cantidad de acciones que se emitirían cuando se creara la corporación, el precio que se pagaría por ellas y la cantidad de las acciones que ad-quirirían los presentes. Entre las partes había una causa válida, la conjunción de voluntades y un objeto lícito, re-quisitos en nuestro ordenamiento para que un contrato sea válido. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391.
A menos que el incumplimiento con las formalidades por parte de la corporación hagan la suscripción totalmente nula, la corporación no puede contravenir sus actos. En este caso, es claro que la corporación está impedida, por sus propios actos, de negar al doctor Santiago Aponte el acceso al 30% de las acciones por los $25,000 pactados.
Además de los requisitos para que un contrato sea vá-lido, el Art. 5.17 de la Ley General de Corporaciones de 1995, supra, exigía que el acuerdo de suscripción de accio-nes se hiciera por escrito, para que pudiera hacerse efec-tivo contra el suscriptor. Lo mismo requiere el Art. 5.17 de la Ley General de Corporaciones de 2009 (14 L.P.R.A. sec. 3597). Ahora bien, en este caso no se pretende hacer cum-plir el contrato frente al suscriptor, sino que es el suscriptor quien quiere hacer cumplir su contrato frente a la corporación. Para esta situación, la letra de la ley no exige que el contrato sea escrito.
Los tribunales de inferior jerarquía concluyeron que, como el doctor Santiago Aponte no había hecho pago en efectivo por sus acciones, nunca pasó a ser accionista. Eso *223 ignora que las acciones pueden pagarse con el trabajo rea-lizado, como por ejemplo, el trabajo de promotor. Fue esa tarea de promoción de la corporación una de las que adujo el Tribunal de Primera Instancia para referir el caso a una sala de lo civil y determinar si hubo trabajo realizado que quedó pendiente de pago.
De igual forma, el Tribunal de Primera Instancia y el Tribunal de Apelaciones entendieron que, como los otros dos galenos no realizaron pagos por sus acciones, la corpo-ración permanecía sin accionistas. En nuestro ordena-miento jurídico no es posible que una corporación con fines de lucro opere sin accionistas. Sería como un cascarón va-cío, inutilidad que el ordenamiento no puede sancionar.
Nótese que no se trata de una corporación sin fines de lucro que, por lo general, carece de accionistas y no paga dividendos. Tampoco se trata de una corporación con fines de lucro en proceso de organización. Se trata de una corpo-ración que ya estaba en plena operación y prestación de servicios al momento de los hechos que dieron origen a la demanda. Es preciso que las corporaciones en esa etapa tengan una estructura de accionistas a quienes se pueda responsabilizar, por ejemplo, en caso de que surja alguna de las causas para descorrer el velo corporativo.(4) Esta situación no se altera por el hecho de que se trate de una corporación profesional.
Como vimos, la Ley General de Corporaciones de 1995 requiere que las corporaciones profesionales solo tengan profesionales licenciados como accionistas. El Art. 18.03 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. see. 3403), especifica que solamente “[u]na o más personas, cada una de las cuales esté debidamente licenciada o de *224 otra forma autorizada legalmente a prestar los mismos servicios profesionales” estarán autorizadas para incorporarse. La ley no contempla la posibilidad de que haya una corporación de servicios profesionales con menos de un accionista.
Además, el Art. 4.01(k) de la Ley General de Corpora-ciones de 1995 (14 L.P.R.A. sec. 272 l(k)), requiere que los directores sean destituidos por los dueños de una mayoría de las acciones con derecho a votar para elegir directores. Si la corporación no tenía accionistas, como argumentan los demandados, ¿cómo podría explicarse que se removiera al doctor Santiago Aponte de sus funciones como director de la corporación? Nuevamente, los actos de la corporación evidencian que a los tres galenos se les reconocieron pre-rrogativas de accionistas, aunque no hubieran pagado aún por la totalidad de las acciones.
Los tribunales de inferior jerarquía también dieron mu-cho peso a la inexistencia de certificados de acciones válidos. Si bien es cierto que los certificados de acciones sirven como evidencia, no son absolutamente determinan-tes para probar la titularidad de la acción. Fletcher Cyc Corp., supra, Vol. 11, See. 5094, págs. 62-63. Además, ex-pedir el certificado de acción correspondía a la corporación, que no lo hizo. Reiteramos que la corporación no puede beneficiarse de su propia falta.
En conclusión, los actos de la corporación y de los otros accionistas convirtieron al doctor Santiago Aponte en accionista. Corresponde ahora que E.P.S.P.R. tome las me-didas para que se cumpla con el acuerdo que le daría plena titularidad sobre el 30% de las acciones. Es decir, procede que el doctor Santiago Aponte pague los $25,000 de la dis-tribución de dividendos, según acordaron las partes, para que adquiera la plena titularidad del 30% de las acciones. Con esa transacción, quedarían pagadas sus gestiones como promotor de la corporación. Aún está por verse si se le despidió como oficial de la corporación y emergenciólogo en violación de su contrato con la corporación.
*225 IV
Por los fundamentos antes expuestos, revocamos la sen-tencia recurrida y ordenamos a E.P.S.P.R. que reconozca al doctor Santiago Aponte como accionista de la corporación, en cumplimiento con el contrato que acordaron las partes para la adquisición del 30% de las acciones de la corporación. Se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos de ma-nera compatible con lo resuelto aquí, y se determine si hubo alguna violación en el despido del doctor Santiago Aponte como oficial y emergenciólogo de E.P.S.P.R.

Se dictará sentencia de conformidad.

 Como los hechos ocurrieron durante la vigencia de la derogada Ley Núm. 144, nos concentraremos en su análisis, y no en el de la nueva Ley General de Corporaciones, Ley Núm. 164 de 16 de diciembre de 2009. Sin embargo, en este aspecto, el análisis es igual para ambos estatutos.

 En lo pertinente, la minuta lee:
“On motion duly made seconded and unanimously carried, it was authorized that the affairs of this corporation will be conducted directly by the above detailed officers, which [sic] are also its stockholders and directors, without the need of any other governing body. From here on as a group they will be named and referred to its [sic] the Board of Directors.” Apéndice, pág. 21.

 En ese extremo, la minuta de la reunión lee:
“On motion duly made, seconded an [sic] unanimously carried, the following resolution was adopted:
*210 “RESOLVED, a proposal is adopted to issue and sell ninty [sic] (90) shares of common stock, thirty (30) to each of the previously detailed share holders at a price of one hundred ($100.00) per share and to issue, and that the Board of directors be, and hereby is, authorized to, from time to time, at its discretion, issue additional shares of common stock up to the total authorized amount by the By-Laws as amended, under the terms and conditions deemed appropriate and under the laws of the commonwealth of Puerto Rico.” Apéndice, pág. 22.

 Si bien es cierto que el velo corporativo solo se descorrerá en situaciones excepcionales, los accionistas de una corporación están sujetos a responder personal-mente en aquellos casos en que los bienes de la entidad sean insuficientes, y se pruebe que se utilizó la figura corporativa para sancionar un fraude, promover una injusticia, evadir una obligación estatutaria, derrotar la política pública, justificar la inequidad o defender un crimen. Srio. D.A.C.O. v. Comunidad San José, Inc., 130 D.P.R. 782, 798 (1992).